## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

TARIQ WYATT,                          :

      **Plaintiff**          :   **CIV. ACTION NO. 1:23-CV-1457**

      **v.**                :          **(JUDGE MANNION)**

C.O. WEST, *et al.*,                  :

      **Defendants**        :

## MEMORANDUM

This is a prisoner civil rights case in which the court previously converted defendants' motion to dismiss into a motion for summary judgment on the issue of exhaustion of administrative remedies and granted defendants summary judgment on that issue. After the United States Court of Appeals for the Third Circuit vacated that decision and remanded the case to this court for further proceedings, the court issued an order giving the parties the opportunity to provide supplemental briefing addressing the arguments for dismissal that were not addressed in the court's previous ruling. Those deadlines have since passed, making the defendants' original motion to dismiss ripe for review. For the reasons set forth below, the court will grant the motion to dismiss, dismiss plaintiff's complaint without prejudice except to the extent that it asserts a due process claim against defendant

Wiederhold, grant plaintiff leave to file an amended complaint, and deny plaintiff's motion to appoint counsel.

## I.   BACKGROUND

Plaintiff, Tariq Wyatt, is currently incarcerated in Benner Township State Correctional Institution ("SCI-Benner Township") but was incarcerated in Mahanoy State Correctional Institution ("SCI-Mahanoy") at all relevant times. He filed this case on August 27, 2023.[1]

According to Wyatt's complaint, he is classified by the Pennsylvania Department of Corrections ("DOC") as a D Stability Code, which is given to inmates with "the most significant mental health needs." (Doc. 1 ¶14). His D Stability Code led to his placement in a Residential Treatment Unit ("RTU"). (*Id.*) The complaint alleges that the defendants, prison officials who were employed by SCI-Mahanoy during the relevant period, were aware that Wyatt is "mentally ill," but does not specify what mental illness he suffers from.[2] (*Id.*)

---

[1] The complaint is deemed filed on the date it was submitted to prison officials pursuant to the prisoner mailbox rule. *Pabon v. Mahanoy*, 654 F.3d 385, 391 n.8 (3d Cir. 2011).

[2] Wyatt states in his brief in opposition to the motion that he "has been diagnosed as schizo-affective, with anxiety and depression, personality disorder, with auditory hallucinations," (Doc. 24 ¶3), but this information is not included in his complaint.

The complaint alleges that while Wyatt was in the RTU he came in contact with defendant West, a correctional officer, on an unspecified date. (*Id.* ¶20). According to the complaint, West began bringing a "handball" to work in the DTU, which he regularly bounced off the floor and the walls while patrolling the unit. (*Id.* ¶21). One day, while Wyatt was in his cell trying to sleep, he was awakened by a loud "boom" sound in his dreams, which he learned was caused by West bouncing the ball off the walls of the unit. (*Id.*) Wyatt subsequently spoke to the prison's psychiatric staff about West bouncing the ball, but it is unclear if the psychiatric staff took any action to stop West from doing so at that time. (*Id.* ¶22).

On an unspecified later date when Wyatt was bouncing his ball in the cell, Wyatt approached him and asked him, "what the fuck is wrong with you?" (*Id.*) West purportedly responded, "nothing is wrong, I just don't like your case." (*Id.*) Wyatt then "cursed the defendant out some more, and even threatened him bodily harm if he ever came near [him] again." (*Id.*) West issued a misconduct citation against Wyatt, which caused Wyatt to be placed in the prison's Restricted Housing Unit ("RHU"). (*Id.*)

During the resulting disciplinary hearing, Wyatt purportedly pleaded not guilty to the charges. (*Id.* ¶23). The disciplinary hearing officer allegedly stated that he believed Wyatt's version of events, but nonetheless found him

3

guilty and sentenced him to disciplinary time. (*Id.*) Wyatt was subsequently moved to another unit in the prison, before then being transferred back to the RTU, despite requesting that either he be placed in a different unit or West be assigned to a different unit. (*Id.*)

After Wyatt's return to the unit, West continued to bounce his ball while working in the unit, and began bouncing the ball off a metal wall on Wyatt's cell "as hard as he could" during moments when it was otherwise particularly quiet in the unit. (*Id.* ¶25). Wyatt purportedly "respectfully" asked him to stop on multiple occasions, but West either "curse[d] at" him or "ignore[d] him completely." (*Id.*)

In addition to throwing the ball, the complaint alleges that West began regularly screaming "AAAAH," which Wyatt believed was meant to mock him for involuntary noises he sometimes makes as a result of "psychotropic medications" he had been "forced to take" on an earlier date.[3] (*Id.* ¶26). Wyatt asked West to stop, but West responded, "fuck you, I don't care, I do what the fuck I want," and "he can do it, why can't I?" (*Id.*) West purportedly stopped the conduct only when directly ordered to do so by psychiatric staff, but then began again after the psychiatric staff left the area. (*Id.*)

---

[3] There is no allegation of when this purportedly involuntary admission of medication occurred, nor is there any allegation that West or any other defendants were personally involved in that incident.

After several more interactions between Wyatt and West, Wyatt approached West and said to him, "listen man, I know we have some issues, and I'm trying so very hard to put them behind us," at which point West told Wyatt to "get to the point." (*Id.* ¶28). Wyatt then continued, "listen man, I'm trying to sleep, could you please…" which caused West to again interrupt him and say "fuck you, I do what I wanna do, I don't give a fuck." (*Id.*) At that point, a member of the psychiatric staff entered the unit and Wyatt told her what had happened. (*Id.*) The psychiatric staff member asked West to stop antagonizing Wyatt, and Wyatt responded, "fuck you, I do what I wanna do, I don't give a fuck." (*Id.*) Wyatt told the psychiatric staff member that she should get a lieutenant. (*Id.*) Wyatt then surmised from West's physical appearance that he intended to "chase" the psychiatric staff member, which caused Wyatt to block the doorway and ask West if he intended to hurt her. (*Id.*) Wyatt purportedly told West that he should sit down until the lieutenant arrived and West did so. (*Id.*) The lieutenant then purportedly arrived and removed West from the housing unit. (*Id.*)

West remained off the unit for "some time," but the complaint alleges that when he returned, he began his "shenanigans" again. (*Id.* ¶29). On June 30, 2023, West purportedly woke Wyatt up by screaming in the hall. (*Id.*) Wyatt asked him to stop, and West allegedly responded, "fuck you, I do what

5

I wanna do, I don't give a fuck." (*Id.*) Wyatt threatened to sue him, which led West to file misconduct charges against him. (*Id.*) Wyatt was subsequently placed in the RHU as a result of the misconduct charges. (*Id.*)

While in the RHU, Wyatt requested that he be given an inhaler due to "breathing complications." (*Id.* ¶30). The complaint alleges that "some years" previously, it was "recommended," that Wyatt try an "asthma inhaler" because he was experiencing "chronic bronchitis," and it was believed that the inhaler could help his symptoms. (*Id.*) The complaint notes that Wyatt "does not have these breathing complications too often," but that they happen "more often" when he is in the RHU, which he believes is due to "remnants" of pepper spray being used in previous incidents in the RHU. (*Id.*) Wyatt's understanding was purportedly that he could get an inhaler when he requested. (*Id.*) Wyatt alleges that he requested an inhaler on "at least" two occasions while he was in the RHU as a result of the disciplinary charges issued by West. (*Id.*) Prison officials, one of whom "may have been" defendant Toms, a registered nurse, initially denied the requests for inhalers, but allegedly gave him the inhalers "after a few phone calls and some checking of plaintiff's records." (*Id.*) The complaint later states, however, that Wyatt "has still not been given his inhaler." (*Id.* ¶40).

6

Wyatt filed a grievance about the denial of inhalers, and defendant Toms purportedly "lied" in response to the grievance by stating that there was no medical order or prescription for Wyatt to receive an inhaler and that he only had an inhaler "for a couple of days in October 2022." (*Id.* ¶32).

Wyatt further alleges that defendant Cespeda "retaliat[ed]" against him while he was in the RHU by calling him a "snitch" in front of other inmates. (*Id.* ¶33). The complaint asserts, however, that this retaliation did not begin when Wyatt was placed in the RHU and that it had been going on "for years" prior to his RHU placement. (*Id.*) Wyatt purportedly "made it worse" when he responded to Cespeda calling him a snitch by stating, "watch, you give me something to snitch on and I'm going to snitch on you." (*Id.*)

The complaint further alleges that Wyatt was denied a pillow in his cell in the RHU. (*Id.* ¶35). Wyatt requested a pillow on June 30, 2023, but was not given one until July 4, 2023. (*Id.*) Defendant Cespeda purportedly told Wyatt during this period that he had instructed other correctional officers to "not give [him] shit" because Wyatt was a "snitch bitch." (*Id.* ¶36). Another inmate purportedly requested a pillow during this period near Wyatt's cell, and Cespeda responded, "oh my man in #14 cell, what you say, you need a pillow, oh of course, I'll be right back with a brand new pillow for you, but Wyatt in #1 cell ain't getting shit." (*Id.*) Cespeda then purportedly brought the

other inmate the pillow. (*Id.*) Other correctional officers purportedly said "fuck you" or laughed at Wyatt when he requested a pillow after Cespeda told them not to give him one, despite Wyatt telling them that he was in serious pain without a pillow.[4] (*Id.* ¶37).

Wyatt allegedly requested to speak with psychiatric staff numerous times during his time in the RHU. (*Id.* ¶38). Several correctional officers purportedly responded, "fuck you," to these requests, and Wyatt was not allowed to see a member of the psychiatric staff until he threatened legal action. (*Id.*) The complaint states that when he requested to speak with psychiatric staff, "sometimes he does [speak to psychiatric staff], but most times he is denied." (*Id.*)

On July 5, 2023, defendant Wiederhold, a disciplinary hearing officer in the prison, conducted the disciplinary hearing arising from West's misconduct charges against Wyatt. (*Id.* ¶ 42). Wiederhold purportedly refused to allow Wyatt to call witnesses but did not state any security concerns that would justify such an action, merely stating that he did not need to hear from witnesses to determine whether Wyatt was guilty. (*Id.* ¶43). Wiederhold purportedly found Wyatt guilty based solely on West's

---

[4] The complaint notes that Wyatt was diagnosed with scoliosis years earlier, which allegedly makes it painful to sleep without a pillow.

misconduct report. (*Id.* ¶44). Wiederhold purportedly also refused to hear testimony from members of the psychiatric staff despite Wyatt informing him that he has "mental health issues." (*Id.* ¶45). Wiederhold purportedly stated that Wyatt's account of the incident was more plausible than West, but nonetheless found Wyatt guilty of the charged misconduct. (*Id.* ¶46).

Wyatt purportedly spoke with defendant Banta, the prison's deputy superintendent, about his problems with defendant West on an unspecified date. (*Id.* ¶48). Banta purportedly stated that Wyatt might be moved to the prison's other RTU housing block, but Wyatt protested that he had done nothing wrong and that West should be moved instead. (*Id.*) Banta purportedly stated that she "could not possibly go around moving her officers, for one little problem, with one inmate." (*Id.*) Banta subsequently moved Wyatt to another housing block, but Wyatt then learned that West was also stationed on the new housing block. (*Id.* ¶49). Wyatt explained to Banta while she was making rounds in the block that West was on the block, but Banta purportedly stated that she "did not care." (*Id.*) Wyatt threatened to sue her, and Banta then walked away. (*Id.*)

When Wyatt arrived in the new housing unit, he discovered that several items of personal property had not been transported to the new unit, including a television and several pages of "coloring pages" that Wyatt used

for "his artwork." (*Id.* ¶50). Wyatt asked defendant Hemperly, who was responsible for moving his personal property, what happened to the missing items, and she purportedly told him that the items had been thrown away. (*Id.*)

Wyatt requested to speak with a member of the prison's psychiatric staff after his interaction with Hemperly. (*Id.* ¶51). Hemperly purportedly responded, "what did you say, you gotta do something about this, what are you gonna do, are you threatening me in front of all these people?" (*Id.*) Wyatt then threatened to sue her, at which point Hemperly called the psychiatric staff. (*Id.*) Wyatt subsequently discovered that several copies of grievances he had filed and several pages related to ongoing civil litigation were also missing from his personal property. (*Id.* ¶55).

The complaint asserts claims for violation of the Americans with Disabilities Act ("ADA") and Rehabilitation Act ("RA"), deliberate indifference in violation of the Eighth Amendment, retaliation in violation of the First Amendment, violation of Wyatt's right to due process under the Fifth and Fourteenth Amendments, and violation of Wyatt's First Amendment right of

10

access to the courts.[5] (*Id.* ¶¶58-64). Wyatt seeks injunctive relief, declaratory relief, and damages. (*Id.* ¶¶65-67). The named defendants are West, Hemperly, Banta, Toms, Cespeda, Green, Wiederhold, and two John Doe defendants. (*Id.* ¶¶4-13).

Defendants moved to dismiss the complaint on January 8, 2024, arguing that dismissal was appropriate both because Wyatt failed to exhaust administrative remedies and because his complaint failed to state a claim upon which relief could be granted. (Doc. 14). On April 4, 2024, the court issued an order in which it noted that defendants' exhaustion argument would require consideration of matters outside of the pleadings that could not properly be considered on a motion to dismiss. (Doc. 25). The court accordingly converted the motion to a motion for summary judgment to the extent it asserted failure to exhaust administrative remedies and directed the parties to file statements of material facts and supplemental briefs in connection with the motion for summary judgment. (*Id.*)

After considering the parties' supplemental submissions, the court granted defendants summary judgment on the issue of failure to exhaust

---

[5] The complaint also states in conclusory fashion that it is advancing an equal protection claim, but does not state what factual allegations support this claim. (*See* Doc. 1 ¶ 59). The equal protection claim will be dismissed for failure to state a claim upon which relief may be granted given this complete absence of supporting allegations.

administrative remedies on August 29, 2024, and accordingly did not reach defendants' other arguments for dismissal. (Docs. 35-36). Wyatt appealed, (Doc. 40), and the United States Court of Appeals for the Third Circuit vacated the court's judgment and remanded the case for further proceedings on February 2, 2026. (Doc. 49).

On remand, this court reopened the case and gave the parties an opportunity to submit supplemental briefs addressing the arguments for dismissal that the court did not reach in its original ruling. (Doc. 50). Neither party submitted additional briefing, which made the original arguments for dismissal ripe for review on February 27, 2026. (*Id.*) Wyatt has since filed a motion for appointment of counsel and a "request" for the case to "move forward." (Docs. 52-53).

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief may be granted." Under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009 (quoting *Phillips v. County of Allegheny*, 515 F.3d 224, 231

(3d Cir. 2008)). While a complaint need only contain "a short and plain statement of the claim, Fed. R. Civ. P. 8(a)(2), and detailed factual allegations are not required, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (quoting *Twombly*, 550 U.S. at 556). "[L]abels and conclusions" are not enough, *Twombly*, 550 U.S. at 555, and a court "is not bound to accept as true a legal conclusion couched as a factual allegation." *Id.*

In resolving a motion to dismiss, the court thus conducts "a two-part analysis." *Fowler*, 578 F.3d at 210. First, the court separates the factual elements from the legal elements and disregards the legal conclusions. *Id.* at 210-11. Second, the court determines "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief." *Id.* at 211 (quotations omitted).

Courts must liberally construe complaints brought by *pro se* litigants. *Sause v. Bauer*, 585 U.S. 957, 960 (2018). *Pro se* complaints, "however inartfully pleaded, must be held to less stringent standards than formal

13

pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

## IV.   DISCUSSION

Defendants seek dismissal of all of Wyatt's claims except his due process claim against defendant Wiederhold[6] for failure to state a claim upon which relief may be granted. The court will consider defendants' arguments in the order in which they are presented in defendants' brief.

### A.   Personal Involvement

Defendants first seek dismissal of several claims on the basis of failure to allege personal involvement. Specifically, defendants note that Wyatt appears to name all defendants with respect to all of his claims, which they argue is improper because the factual allegations in the complaint clearly indicate that only certain defendants are involved in each specific claim. (Doc. 21 at 18). Wyatt argues in opposition that all defendants knew of and acquiesced in the other defendants' conduct and were therefore personally involved. (Doc. 24 at 10).

---

[6] Defendants note that they seek dismissal of the claims against Wiederhold for failure to allege personal involvement to the extent he is being sued for the actions of the other defendants, but "do not challenge" the due process claim against him. (Doc. 21 at 12 n.5).

14

The court agrees with defendants. A defendant cannot be liable for a violation of a plaintiff's civil rights unless the defendant was personally involved in the violation. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 289 (3d Cir. 2018). The defendant's personal involvement cannot be based solely on a theory of *respondeat superior*. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). Rather, for a supervisor to be liable for the actions of a subordinate, there must be allegations of personal direction or actual knowledge and acquiescence. *Id.*

Here, based on a review of Wyatt's complaint, the court construes his ADA, RA, and deliberate indifference claims as being asserted against defendants West and Cespeda, his retaliation claim to be asserted against Cespeda, his due process claim to be asserted against defendant Wiederhold, and his access to courts claim to be asserted against defendant Hemperly. To the extent any other defendants are named with respect to these claims, the complaint fails to state a claim upon which relief may be granted because it fails to make sufficient allegations of their personal involvement.

## B.   Access to Courts

Turning to the specific allegations of Wyatt's claims, the court first considers Wyatt's access to courts claim against defendant Hemperly.

15

Access to courts claims require allegations that (1) prison officials impeded the plaintiff's access to courts and (2) the plaintiff suffered actual injury in his ability to access the courts. *Lewis v. Casey*, 518 U.S. 343, 351 (1996); *Rivera v. Monko*, 37 F.4th 909, 915 (2022). To show an actual injury, the plaintiff must show that the defendants' actions have impeded his ability to bring a nonfrivolous or arguable legal claim. *Monroe v. Beard*, 536 F.3d 198, 205 (3d Cir. 2008).

Here, defendants correctly argue that dismissal of Wyatt's access to courts claim is appropriate because he has failed to allege any actual injury to his access to the courts. Wyatt alleges that Hemperly destroyed several copies of grievances he had filed and several pages related to ongoing civil litigation, (*see* Doc. 1 ¶55), but he fails to specify how this affected his ability to pursue a nonfrivolous or arguable legal claim. *See Monroe*, 536 F.3d at 205. The court will accordingly dismiss the access to courts claim.

## C.    Retaliation

To plead on a retaliation claim, a plaintiff must allege: (1) he engaged in constitutionally protected conduct; (2) the defendant took retaliatory action against him that was sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) there was a causal connection between the protected conduct and the retaliatory action. *Mitchell v. Horn*,

16

318 F.3d 523, 530 (3d Cir. 2003). Causation may be pleaded by alleging either an unusually suggestive temporal proximity between the plaintiff's protected conduct and the defendant's allegedly retaliatory action or a pattern of antagonism coupled with timing. *Dondero v. Lower Milford Twp.*, 5 F.4th 355, 361-62 (3d Cir. 2021) (citing *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)). Causation may also be implied by "the record as a whole." *Id.* (citing *DeFlaminis*, 480 F.3d at 267).

Here, Wyatt plainly fails to allege that he engaged in protected conduct. He alleges that Cespeda retaliated against him in various ways when he was placed in the RHU, but he does not specify what complaints or grievances gave rise to this retaliation, when those complaints or grievances were made, or any other facts from which it could be inferred that Wyatt engaged in protected conduct. (*See* Doc. 1 ¶33). Wyatt also plainly fails to allege a causal connection between his protected conduct and Cespeda's allegedly retaliatory actions: he acknowledges that the alleged retaliation by Cespeda had been going on "for years" prior to his placement in the RHU. (*Id.*) Thus, on the facts as presently pleaded, it cannot be inferred that Cespeda's actions were done in retaliation for any recent protected conduct by Wyatt. The retaliation claim will accordingly be dismissed for failure to state a claim.

17

## D.    Deliberate Indifference

To state a claim for deliberate indifference to a serious medical need, a plaintiff must allege "(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (citing *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999)). A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would recognize the necessity for a doctor's attention." *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987). A prison official acts with deliberate indifference when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "A plaintiff's mere disagreement as to the proper medical treatment" is not sufficient to support a deliberate indifference claim. *Lanzaro*, 834 F.2d at 346.

The deliberate indifference standard "affords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate patients," and courts must accordingly "'disavow any

18

attempt to second-guess the propriety or adequacy of their particular course of treatment' so long as it 'remains a question of sound professional judgment.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 538 (3d Cir. 2017) (quoting *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979)). A claim that "a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Id.* (quoting *Estelle*, 429 U.S. at 106). Thus, claims that a physician has "inadequately diagnosed and treated" a plaintiff's medical condition does not amount to a violation of the Eighth Amendment if the physician was exercising his professional judgment in his diagnosis and treatment. *Id.*

Wyatt's complaint appears to allege that defendants were deliberately indifferent to a serious medical need based on (a) prison officials' interference with his mental health treatment and (b) prison officials failing to give him an inhaler. Both claims fail. Wyatt does not allege any sustained failure to provide mental health care; he simply alleges that on several occasions his requests to speak with a member of the prison's psychiatric staff were denied. It appears that throughout the period relevant to his claims, he was given regular mental health treatment. (*See* Doc. 1 ¶38).

19

As for the claim regarding the inhaler, it is not clear from Wyatt's convoluted allegations that he actually has a serious medical need for an inhaler. (*See* Doc. 1 ¶30 ("some years ago, after numerous bouts of, it seemed, chronic bronchitis, and even after treatment, still experiencing some type of breathing complications, varying from shortness of breath, to breathing rapidly, etc., plaintiff does not have asthma, but it was recommended to plaintiff to try an asthma inhaler, that this had worked for some people with some symptoms that plaintiff had been encountering, only it was known to only, sometimes, work, and was just a probable remedy which might not work at all, for plaintiff, and at first, it didn't work at all for plaintiff, but he was told to give it a chance, that again, even if it did work, it might not work all of the time, which was hard to foresee, because plaintiff does not have these breathing complications too often..." (cleaned up))). Thus, based on the facts as currently alleged, he has not sufficiently pleaded that defendants were deliberately indifferent to a serious medical need when they denied him an inhaler.

Wyatt's complaint also fails to state a claim for violation of the Eighth Amendment to the extent that it alleges that the denial of a pillow for four days and the verbal harassment and teasing by defendant West violated his constitutional rights. As defendants correctly note, (*see* Doc. 21 at 23-24),

20

neither the denial of a pillow for four days nor verbal harassment and teasing violate the Eighth Amendment. *See, e.g., Adderly v. Ferrier*, 419 F. App'x 135, 139-40 (3d Cir. 2011); *Washington v. Rozich*, 734 F. App'x 798, 801 (3d Cir. 2018).

### E.    ADA and RA Claims

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. §12132. The RA similarly provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . ." 29 U.S.C. §794.

Claims of discrimination pursuant to the ADA and RA are analyzed under the same substantive standard. To prevail under either statute, a plaintiff must show that he "(1) has a disability; (2) was otherwise qualified to participate in a [government] program; and (3) was denied the benefits of the program or was otherwise subject to discrimination because of [his]

21

disability." *Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009).

Wyatt's complaint plainly fails to state a claim under this standard. He does not explain what program or service he was denied because of his mental illness or any other disability. (*See* Doc. 1). To the extent the ADA and RA claims are based on the denial of mental health treatment, it appears from the complaint that he was housed in an RTU for the entire period relevant to his claims and regularly provided mental health treatment. Thus, the court will dismiss the ADA and RA claims for failure to state a claim upon which relief may be granted.

### F.    Leave to Amend

Before dismissing a civil rights complaint for failure to state a claim upon which relief may be granted, a district court must permit a curative amendment unless the amendment would be inequitable or futile. *Phillips*, 515 F.3d at 245. The court will grant plaintiff leave to file an amended complaint because it cannot conclude at this stage that amendment would be inequitable or futile.

### G.    Motion to Appoint Counsel

Finally, having resolved all issues pertaining to defendants' motion to dismiss, the court will consider Wyatt's motion to appoint counsel. (Doc. 52).

22

Having reviewed the motion in light of the relevant factors,[7] the court will deny the motion because plaintiff appears to be able to litigate the case on his own behalf, the case does not present particularly complex legal issues, and the case will not likely require significant factual investigation or expert testimony.

## V.   CONCLUSION

For the foregoing reasons, the court will grant defendants' motion to dismiss, dismiss plaintiff's complaint without prejudice except to the extent that it states a due process claim against defendant Wiederhold, grant plaintiff leave to file an amended complaint, and deny his motion to appoint counsel. An appropriate order shall issue.

Malachy E. Mannion
United States District Judge

Dated: 5/20/26
23-1457-02

---

[7] When considering whether appointment of counsel is warranted, a court should consider: (1) the plaintiff's ability to present his case; (2) the complexity of the particular legal issues; (3) the degree to which factual investigation is required and the ability of the plaintiff to pursue such investigation; (4) the amount a case is likely to turn on credibility determinations; (5) whether the case will require testimony from expert witnesses; and (6) the plaintiff's ability to retain and afford counsel on his own behalf. *Montgomery v. Pinchak*, 294 F.3d 492, 499 (3d Cir. 2002).